Good morning, Your Honor. If the court please, I'd like to have 20 minutes for opening argument, 10 minutes for rebuttal. You've got the clock there. Whatever time you have left, why don't we let you sit down. Thank you. The court prejudicially erred in imposing terminating sanctions on Mr. T.G. failed to prove that any of Brotby's discovery mistakes interfered with the rightful decision of the case or with its ability to go to trial. The court may recall that at the outset of discovery, the magistrate judge said that there would be no receipt of anything with respect to the merits of the action. That's rather an unusual statement for the beginning of discovery. The magistrate judge did not explain that statement, but the record shows very clearly why he did that. Because the district court had issued a preliminary injunction against Mr. Brotby, which required that court to decide that the covenant not to compete was valid and enforceable and that Mr. Brotby had violated it. So we get back to where all of this begins, which is the prejudice. Wouldn't that have been a determination that it was probably valid and enforceable? It's the nature of the preliminary injunction is you have to sort of predict the future. That is right. But here the situation, Judge Kuczynski, was that by the time the matter could be corrected on appeal, the six months would have been over. So that what happened was a speed flight through all the procedures that should have been undertaken in order to grant a preliminary injunction in the first place. The preliminary injunction was riddled with the most gross of procedural errors as well as substantive errors. Is that an issue before us? I thought the issue was whether there was an abuse of discretion in the imposition of the litigation terminating sanction. There is not an abuse of discretion. Well, that's the issue, isn't it? You agree. And that's a threshold issue. That's not the only issue. Well, if we find there was no abuse of discretion, that's the end of it, is it not? I don't see how under the circumstances the Court could reach that conclusion. All right. Well, you disagree. But I'm just saying for purposes of structuring the issues, if we find that there was no showing of abuse of discretion, then isn't that the end of the appeal? It would be. Okay. It would be a miscarriage of justice. Well, that's. But it would be. But the problem is that there are no basis whatsoever to have issued terminating sanctions. That's the question. Yes. Okay. Why do you say that? I say that because there was no basis at all to have terminating sanctions imposed. And the error of discretion is minute with respect to the imposition of terminating sanctions. Why? Because there was no interference on any of the mishaps in discovery which could have interfered with the rightful decision of the case or which could have interfered with the right of CKJ to go to trial. Well, we have three days of evidentiary hearing followed by a 30 some odd page opinion by the magistrate judge, which could be fairly read to report to reflect a record of total obstruction of the plate efforts of the plaintiff to conduct discovery. Now, isn't that enough to support the record? Does not support what the findings were. The record does not support the findings. Yeah. Well, in the first place, you have to decide that that there was a cause of action or a claim for relief that was stated in the first place. You don't get to discovery until you get there. You mean it's a threshold determination before you can conduct discovery that there's a cause of action? Before you can determine whether terminating sanctions interfered with the rightful decision of the case. The authorities are Legion, including those from this circuit, which require as a condition proceed to imposing terminating sanctions, that there is a basis to establish that the discovery did interfere with the ability to go to trial or interfered with the rightful decision of the case. And that record is barren of any such thing. Totally barren. Well, it wasn't part of what they were trying to find out. I have to do with his employment for the work that he did for Alaska after on behalf of the of the of the competitor. But he did for Alaska, which involved the same kind of services. And as I understand it, the kind of things that were trying to get them were unable to get. And this is, you know, so good in the second. But that's what the magistrate judge seems to find is that the amount of income, the kind of work he did, what documents he might have taken with him. I mean, the response to documents is quoted repeatedly as being sort of flippant and unresponsive. You know, what documents did you take with you? This is the kind of thing that clearly falls within the plaintiff's claim. It's kind of thing they wouldn't know what he took with him. And yet they don't give him the response. Well, the fact is, all of those questions were answered. The only thing that the complaint was about is that they weren't answered as fast as CTG wanted. But they got every one of those documents. Every single one of them. Well, was that issue raised below? Sure. The issue that you're now raising. Yes. In the appeal to the district court from the magistrate decision. All of this was raised. It wasn't raised very artfully, but it was raised. I'm sorry. So just to make sure I understand. You say that they did get a response, for example, the interrogatory of how much money he earned. Absolutely. Not only did Mr. Brotby produce everything that was in his possession on the subject, but he also provided all of the information that Mr. Brotby did not receive. He provided all of the information that Mr. Brotby did not receive. Allie Eska offered to give the CTG all of its records with that respect. And CTG refused to accept it because it had not been sworn to and had not been properly validated. But whether they got some or could have gotten somewhere else, did Mr. Brotby actually provide the information? Oh, yes, he did. He provided all of it. The only thing they're complaining about is that Mr. Brotby did not retain his W-2s. He did not. He gave them to his tax preparer. And that he did not have all of the invoices that he submitted. He gave everything he had to them. And therefore, there was no mystery about what he was paid or by whom. All of that information was available and he gave everything in his possession to them. What they're complaining about is that Mr. Brotby's record keeping was not as nice and neat as it should have been. Well, here we have a finding by the magistrate judge. The defendant has still not produced certain W-2 forms nor any completed 1099-RS tax forms. Has not produced. And you're saying that was wrong. I'm saying they were not produced because they were not in his possession. What the testimony was is that those documents had been given by Mr. Brotby to his tax preparer and he did not retain a copy. Well, it wasn't incumbent on him to get them from the tax preparer? The tax preparer no longer kept them. And what his lawyer did then was he produced the tax returns that were filed from the IRS. That also was given to the possession of CTG during the discovery. What about the question that he was asked about what documents he took with him? He answered them. The answers were somewhat delayed, but he gave them 100 percent of a complete list of every single solitary item. That he took with him. Pardon? Everything that he took with him. Absolutely everything. And this was after a motion to compel? Yes. And after an order by the magistrate judge? Yes. He produced every single tiny slip of paper he ever had. There were five, as I recall, five orders. Yes. Although numerous of those orders were in fact denied by the magistrate judge and the production of everything that had been sought was eventually produced. The only issue here is whether or not the slow production somehow prevented the rightful decision of the case. But by the time you find out the rightful decision of the case, one must recognize that the whole discovery began when the district court had made a decision which was flatly contradicted by the law. That there had been a valid covenant that was breached. The district court, this case should never have reached a discovery session anyway. Well, there's no motion to dismiss the case for some reason. That doesn't have to be. What the court was required to do and did not do is the Claxton case from the Supreme Court of the United States required the district court on its own to apply the conflict laws of the state of Alaska, which must be done by every district court in a diversity case. Without a motion. Without a motion. The Supreme Court says nothing about a motion. So that's a fundamental error. If the court fails to respond to make a determination of conflict of law. Well, the Supreme Court says so. That's good enough for me. The Supreme Court talked about the appropriate choice of law. I don't recall. It said that where you don't have a choice of law clause and you are in a diversity case, the court must apply the law of the forum. Well, no dispute about the Claxton case. The question is whether there was no motion in this case. It infects the validity of the proceedings because the court didn't do it so responsibly. I think that there is a very good reason why there was not a motion. Let me take you back to the beginning of this procedure. In the first place, the preliminary injunction was heard while the plaintiff had not given even the required five days written notice of the hearing on the preliminary injunction. There was no notice given. The lawyer who was retained less than 24 hours after the proceedings began asked the court for a continuance. With no reason given at all, the court simply denied a brief continuance. That lawyer had no time to prepare the matter at all. If the lawyer had had any time to prepare, the lawyer could have no doubt found the appropriate authority to point out that the conflict law of the ---- Well, that happened in the preliminary injunction stage. It was much that happened afterwards. And even if the lawyer blew the law at the preliminary injunction stage, he had plenty of opportunity to raise it in the district court afterward, including at the time of the hearing on the damages. That lawyer disappeared immediately after the end of the preliminary injunction matter. It sounds like the last case we had. Well, this doesn't involve the imprisonment or life. It involves driving a man into bankruptcy on a covenant that is totally void. Totally void. It's more void in California than Alaska. Ah, yes. But you see, if you apply the principles of conflict law of Alaska, which the court was required to do, then you find out that both Alaska and California apply restatement section 188 of conflicts. And when you go down the litany of everything you have to do on that, you'll decide that there was no way that California law did not apply. The contract was I mean, first of all, it was the forum state. I beg your pardon. The forum. Oh, yes. Sure. And the contract was to be carried out in Alaska. Oh, no. Oh, no, no. That covenant was signed in California by a California domiciliary. Alaska had no contacts at all. I'm sorry. The services. The service. I beg your pardon. Where were the services to be performed? Any place in the United States or the world in which CTG had offices. Well, he was hired, was he not, to work on the pipeline project? Oh, no. Oh, no, no, no. He wasn't hired at all when that document was signed. CTG's own evidence showed that everybody who ever was going to be put in a bank someplace who could possibly have been hired as an at-will employee was required to sign that covenant. That covenant was signed in California by a California domiciliary. Alaska had nothing to do with it. There was no hint that he would ever be sent to Alaska. Indeed, he was sent in the eastern part of the United States before he was ever sent to Alaska. Alaska had nothing to do with it. You have about five minutes left. I better save it for rebuttal. Thank you. May it please the Court. My name is Valley Fisher. I represent Computer Task Group in this matter. I'm the only attorney for either side who can claim the distinction of having been the attorney on this matter since its inception in 1997. I'm familiar with the record, and any questions the Court may have, please interrupt me at any time. Living in Arizona and practice limited to Alaska law. Is that right? I'm admitted in Arizona now, Your Honor, yes. You look like you live in Arizona, but you have a practice limited to Alaska law. I found that remarkable. It's on your brief. I was originally when I moved there, Your Honor. I believe it. I'm not doubting it. Oh, no. It's remarkable. I'm happy to report that. I'm happy to report that I took the Arizona bar and am now admitted to the Arizona bar. Okay, terrific. Thank you. I have a procedural question before you get into the merits. The district judge here, in his order, he reviewed two things. He reviewed the terminating sanctions, and then he also reviewed the record on the proof of damages. And I noticed that when he reviewed the terminating sanction, he said that he deferred to Judge Branson's credibility determinations, but in all other matters exercised independent judgment, whereas when he reviewed the other part of the order, he exercised an overview on everything. And I'm just wondering whether a magistrate judge has authority to enter, to make findings on what is at this point no longer a discovery matter. It is now a matter of sanctions that could have the effect of terminating the case, and whether the district judge really can defer. Isn't the district judge required to do de novo review on those facts? Yes, Your Honor, the judge is required to do de novo review. However, credibility decisions under Simpson and under the other cases, Your Honor, credibility decisions, which frequently involves, frankly, eyeballing the people who are in front of you, the lawyers, the parties, the testimony. I believe, Your Honor, that the credibility determinations... Well, it's a matter that's properly given within the authority of the magistrate judge. If it's not, then the district judge, then exactly the other way around, the district judge has to do the eyeballing. And I realize that in discovery matters, you can refer matters to the magistrate judge. On the merits, you can refer matters to the magistrate judge only with the consent of the parties, and I gather there was no consent in this case. Here we have a sanctions proceeding. Magistrate judge is making findings of fact that have the effect, this is not who struck John in terms of discovery, but actually terminated the case, and yet he's doing the eyeballing. And I'm just wondering where the authority to do that comes from, whether it is, in fact, the district judge has to get in there and either hold the hearing himself or at least do what he did here as respect to the rest of the thing, which is to review the record of the noble and make his own credibility findings. I... Yes. Do you understand the question? I do exactly, Your Honor. Okay. And it would probably be more helpful for me to provide a supplemental resource regarding that. I do note that Mr. Brophy never made an objection on those grounds, and it's never been raised before. It was not raised in Mr. Brophy's opening brief or in his reply brief, but I understand completely, Your Honor, the question which you would have. And I would suggest that with Your Honor's permission following this, I'd be happy to provide additional information regarding that credibility. Okay. You've got two days to do it, and then opposing counsel, if she has anything to respond, can do so on two additional days. Thank you, Your Honor. My colleagues. I do note... It's so ordered. So if you have anything on this, you have until the end of business. What's today? Today is Tuesday. I take it. Also, court address whether this has not been waived, since it was never raised at any point in the district court or on the appeal. Is it jurisdictional or not? Yeah. If it's not jurisdictional, it's waived. Yes, Your Honor. It might be waived. Thank you, Your Honor. I do recall in Judge Singleton's final order following the damages hearing that in that order, Judge Singleton mentioned that Judge Branson had found that Mr. Broffey was not credible. And Judge Singleton put in that order it was a finding that he found to be well-supported in the record. Yes, but it's quite different to say that a finding is well-supported in the record and to say I make that finding myself. You understand the distinction? I do, Your Honor. There are lots of times that we look at district court records and say, gee, we think the district judge should have believed the witness, but... Exactly. So you understand the distinction. Absolutely. And, of course, the waiver issue, of course, plays into it as well. So if you have anything to say on those two subjects... Thank you, Your Honor. I will provide it. Okay. The outcome determinative issue... Counsel, I just realized that bridge is a week, and so you have it until the Monday. 48 business hours. Oh, well, thank you. No, no, no. You've got 48. It's Tuesday, so I was just thinking you've got to close the business Thursday, and then counsel will have to close the business Monday to find a response. Thank you, Your Honor. Go ahead. Thank you. The outcome determinative issue before the court today is whether the district court abused its broad discretion in entering litigation-ending sanctions against Mr. Brophy because of Mr. Brophy's willful and prejudicial multiple repeated across the board. Well, opposing counsel puts the issue differently and says you can't impose terminating sanctions without a finding that the misconduct interfere with the just adjudication of the case. What do you say about that? Your Honor, in the court below, the district court made and the magistrate judge made extensive findings of fact on the prejudice which was caused to CTG. They did, but they were really sort of vague. I mean, it is clear that the magistrate judge was torqued with the defendant. There's no doubt about it, and there's no doubt about the fact that he was snide and, you know, probably his own worst enemy in, you know, just the kind of client on the other side that you hope for every time, right, somebody who shoots himself in the foot. But I don't see where, and this is a lengthy report, and maybe you can point us to, where does the district or the magistrate judge point to where the, in its 37-page order, you know, and, you know, here is discovery that for lack of it Plaintiff was unable to proceed with this case. Annoying though it is and bad form and clearly deserving of some sanction, where is the finding that deals with withholding information that precluded the Plaintiff from litigating its case? From litigating its case. Yeah, that's the question. Yes, Your Honor. It's throughout the initial report and recommendation. It's in Volume 6 of the excerpts. I have the report and recommendation. Yes, beginning of 1157. And line number. And I will. Yes. All right. They're actually throughout this. You know, it's not as good an answer. It's so just pick one. OK. Just pick one. All right. That'll get started. Thank you, Your Honor. For example, on page. For example, Your Honor. Page excerpt of record 1164. This, Your Honor, deals with interrogatory number 28. It's page 8 of the report and recommendation. Correct, Your Honor. Thank you. This is in. It's 1164 of the excerpts of record. And it turns out to be page 8 of the report and recommendation. Yes, that's correct, Your Honor. Page 8 discusses CTG's interrogatory number 21. That interrogatory was, please state the revenues you and your associated entities earned each month from Alyeska from March 1, 1997 to the present. This is a fundamental fact. It has to do with a basic fact. How much money did you earn on a monthly basis from CTG's client Alyeska? And what did this fact go to? Damages or? This fact went to both cases, Your Honor. It went to CTG's cases on damages and the extent of Mr. Broffey's wrongdoing. And then on the other side, went to Mr. Broffey's counterclaims against CTG in terms of his claims of monetary gain and loss. Okay. And so on pages 8 through 9, and then on to 10, Judge Branson goes over Mr. Broffey's interrogatory responses. I'm sorry. According to counsel tells us that this information, the revenues information, was eventually provided. That's incorrect, Your Honor. To this day, CTG has never obtained monthly revenues that Mr. Broffey and all of his companies earned from Alyeska. Never. And to this day, even if you leave aside the monthly revenues, we noted in Mr. Broffey's opening brief that monthly isn't referenced. There's a general reference to interrogatory number 21, but it doesn't say that the information sought was monthly revenues. To this day, we've never received monthly revenues. Mr. Broffey's last statement on the subject was Mr. Broffey's third supplemental interrogatory responses, which the court can find in the record at volume 7 of the sealed excerpt of record number. Let me see. Well, it's Mr. Broffey's third supplemental excerpt of record, and in that one, Mr. Broffey continues not to provide the monthly revenues or even the exact total revenues. And that's the problem. So to this day, we do not have that information. And nothing that my opponent mentioned undercuts that. One of the key points which came out of my opponent's discussion was that not a single citation to the record was made to support any of the statements made. One of the underlying problems in this entire case and in Mr. Broffey's opening brief is a lack of record citation to support broad statements of having provided the required discovery. And, in fact, when Mr. Broffey's counsel comes up before the court again following my argument, Mr. Broffey's counsel. On rebuttal. Rebuttal. Thank you, Your Honor. I sometimes words just don't leave me. I know. It will be impossible on rebuttal for Mr. Broffey's counsel to point to anywhere in the record where the exact monthly revenues were provided. In addition, we don't even know. I think if I'm to remember what counsel said and put in a brief and what I anticipate she might say is that. Whether he provided or not, this is information that they had available from other sources. I was perfectly willing to provide information. That's what I think the answer might be. So since you are going to get a chance to stand up again, why don't you tell us what your response is to that? Absolutely, Your Honor. First of all, responses to discovery, a proper response to discovery is never you can get it from some other guy. I understand. So you don't. You don't. Exactly. No, but that's not a good answer. In addition, Your Honor. What we're looking for right now is whether or not failure to provide information will end up obstructing your client's ability to proceed to trial. If they have to go somewhere else, that very well might support sanctions against the party for making them go to that additional trouble. And that's perfectly fine. But if you can't get it from somewhere else, it then turns out not to impair your ability. It makes it a little more difficult to get to trial, but it doesn't impair your ability to go to trial. It's not like, you know, let's say there's only one copy of a document and a party goes out and burns it or shreds it. At that point, it's gone. You can't get it from anywhere else. Because of the absence of a document, we can't really go to trial. Now, that would be case terminating. What Counselor Anderson is saying is, look, yeah, he could have been more cooperative. He should have been more cooperative. He deserved to get bopped, but it didn't really interfere with plaintiff's ability to go forward because they could have gotten it from somewhere else. In this case, Your Honor, regarding this question of what monthly revenues did Mr. Broppe and all of his companies earn from Alyeska, there really was no way, even if CTG had gone to Alyeska, its client, and asked Alyeska to incur legal fees to search through its records to try to respond to this, there would be no way for Alyeska to absolutely know what Mr. Broppe's monthly revenues were. And the reason why is because Mr. Broppe, for example, Mr. Broppe had worked for other entities and then earned monies through other entities rather than through his own name to Alyeska. Alyeska wouldn't have a way of knowing that those revenues funneled back to Mr. Broppe. The reason that that's a concern in this case is because throughout the six-year history of this case, we've learned that Mr. Broppe has been involved in multiple business proceedings, multiple business names, SPI, SPI, Inc., DCE, Pacific Meridian. And Mr. Broppe changed his story for years about what company he worked for, he worked for Alyeska for. At one point, Mr. Broppe would say SPI, and another point it was SPI, Inc. To give a quick and good example of why even now nothing in this case is clear, at the fifth discovery hearing in this matter, and that was the three-day evidentiary hearing on CTG's motion for dismissal and default in February of 2000, that was the fifth discovery hearing we'd had in this case. And there, Mr. Broppe looked Judge Branson in the eye in the stand and testified under oath that all of his Alyeska earnings were put under his company SPI on his Schedule C for his 1997 tax return. Well, over six months later, after the motion for litigation ending sanctions had been granted, when we were in the middle of damages briefing, Mr. Broppe said something completely different under oath. He attached an affidavit to his damages opposition brief, which said that his Alyeska earnings for 1997 were actually on a different entity's Schedule C, an entity called DCE. And there's no explanation for why did Mr. Broppe tell Judge Branson one thing at one hearing and then give a completely different story under oath, both are under oath, in the context of a different motion. And that's one of the, just one small example showing how, to this day, we have no idea any of the most fundamental facts of this case. CTG sued Mr. Broppe six years ago when CTG discovered that Mr. Broppe had resigned from CTG to bring in his own business, some business, to do work for CTG's client Alyeska. Did Alyeska ever offer to provide any records? Your Honor, that refers to information which Alyeska did provide to Mr. Craig Elkin, one of Mr. Broppe's counsel, in March 2000, February 2001, which was after entry of litigation ending sanctions. There's a cite to the record, Your Honor, if you'd like to look at it. It's a seven supplemental, or excuse me, seven sealed excerpt of record 1813. And what that is is it's a letter from Alyeska's outside counsel, Mr. Chuck Flynn, dated February 2001, with some documents attached. Mr. Flynn's letter represents that to Mr. Elkin. Mr. Elkin, you've asked me to look to see income information from Mr. Broppe or Mr. Broppe DBA SPI or Mr. Broppe SPI, Inc. And attached, please, find the records in the amount of $71,733 for Mr. Broppe DBA SPI. However, Mr. Flynn's letter does not represent that there are or aren't earnings for Mr. Broppe under DCE. I'm not completely the master of the dates. That date is after the magistrate's report? Yes, Your Honor, and actually it was after Judge Singleton. After Judge Singleton. Exactly. So here, for example, Mr. Broppe is claiming reversible error on a document which Mr. Broppe did not give the court before entry of litigation and in sanctions. But even there, even after the fact, that document, the letter and the attachments, still don't resolve the issue of, well, what about all these other companies? It gives one kernel of information. It seems there's no doubt that Mr. Broppe made at least $71,733 because of providing services to Alyeska. But amounts beyond that, we don't know. Thank you. Thank you, Your Honor. I should have asked you this question before. But what's your best authority for your fundamental proposition that terminating sanctions can be imposed without a finding that they deprive the ability to try the case fairly, access to fair adjudication? I'll give you just a moment. Yes, there are others as well. I'll take you please back a little bit farther. We have to remember that the discovery proceedings would never have happened at all if the court had not granted the preliminary injunction. There would have been none because there's no case. There was no discovery before the preliminary injunction was granted. There was no notice given properly before that was granted. There were no basis for any findings that there had been any breach. I think you made that point before, but I'd like to know what your authority is, because that seems to be your statement of the pivotal issue in this case. Yes, it most certainly is. I think I have a bunch of them, but I think I can find one for you right away. I'm going to read it in the opening brief at pages 22, 23. And I'll give it to you in a moment. The United States for the use of Wiltek Gouin, which is out of this court, 857 Federal Second, page 22 of the brief. It says delay alone is insufficient prejudice. It has a good deal more to say than that. OK, well, you know, then what it is that the also the Malone case makes the same point that litigating sanctions, of course, deprive a person of any right of defense. And how do you understand pain against the Exxon? Pardon? How do you understand pain against Exxon? Well, I don't think it applies. It lays down the rules pretty clearly. Well, that's a fairly recent one. It's 1998. It's 1998. And there's a great deal of reliance on pain against Exxon. But there was no discussion of a fact situation like this one. Because there the court says the appellants claim they'd eventually complied. But the Ninth Circuit said that's a little late. But that was a case in which there were no due process problems imposed at all. There are no due process questions raised there. Here, in pain against Exxon, remember, this is the plaintiffs who are talking. The plaintiffs, not the defendants. And the plaintiffs simply hadn't produced anything. And they're not showing up for a deposition. And, of course, it had a great deal to do with whether or not you could go to trial. Here, there couldn't have been a trial if the law had properly been applied as the court was required to do. Here, what I believe Judge Swerdlett's saying is that that doesn't count unless there was a proper objection interposed. That's exactly right. And I say that there was not a proper objection interposed. But that poor, hapless lawyer had been denied any opportunity to prepare the case at all. And there had been no due process notice complying with the Federal Rules of Civil Procedure before the matter was called to trial. So you're really asking us to rewind the whole proceedings and start all over again. I'm saying that you can't decide that any mishaps in discovery could interfere with the rightful trial of the case or prevent trial because, effectively, it had already been, I say in quotations, tried because all that remained was not the merits. The discovery did not go to the merits. The parties were not permitted to discover the merits on issues. All that was involved in the discovery was efforts to find out how much damages on liability that the district court had already decided in the preliminary injunction under a proceeding, a covenant that was absolutely void. That is what I call a total miscarriage of justice. So I add, and the Court knows that, that the sealing of all these records, of course, is a violation of due process. There is no basis at all to hold a secret trial in the Federal Court in the United States. And it was done. I thank Your Honor for your time. Thank you, counsel. We will defer submission of this until close of business on Monday to receive whatever additional briefing, very short, no more than five pages, on the question of the magistrate's authority. Perhaps counsel can take advantage of the deferral and submission and consider the possibility of settlement in this case. We have discussed settlement before. Reasonably close to the lunch hour. There are many places to go in Pasadena. They are quite hospitable. Well, alas, I cannot do it today because I am due at Caltech for a Board of Trustees meeting. Well, perhaps you and counsel still here? I see a lonely breeze there. Well, Judge Kuczynski, you want to make clear that's your suggestion. That's Judge Kuczynski's. Well, of course, we are always willing to discuss settlement. That's not the panel's suggestion. It's certainly not Judge Newman's suggestion. Well, it's not the panel's. I'm always ready to discuss settlement on a case. I just can't do it today. Very well. Thank you. Okay. We'll defer submission until Monday. Thank you. I really think you have a point. We'll next hear argument in Rodeo Cannon development. Thank you.  Counsel ready?
judges: Kozinski, Noonan, Schwarzer